In re Raymond and Linouise
MITCHELL, Debtors.

Bankruptcy No. 88–12209.

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

June 30, 1989.

L. Parker McNeil, Clark, Thomas, Winters & Newton, Joseph D. Martinec, Martinec, Hargadon & Wise, P.C., Austin, Tex., for debtors.

Mark Browning, Sheinfeld, Maley & Kay, Austin, Tex., for First City Nat. Bank of Austin.

Russell P. Hale, Austin, Tex., for creditors' committee.

## DECISION AND ORDER ON OBJECTIONS TO CLAIM OF EXEMPT PROPERTY

LEIF M. CLARK, Bankruptcy Judge.

A hearing was held before this court on January 11, 1989 regarding the objections of First City National Bank of Austin to the claimed exemptions of the debtors in this case. The objections focused on the debtors' claim to certain jewelry, including in particular a 6.18 carat diamond ring worn rather regularly by Mrs. Mitchell. In addition to considering whether the jewelry items claimed are exempt under Texas law, *see Fernandez v. Seidler (In re Fernandez)*, 855 F.2d 218 (5th Cir.1988), this court must also grapple with the valuation standard appropriate to the task of determining whether the debtor has claimed in excess of $30,000 in personalty as exempt (Texas sets that figure as the "cap" on the total of personalty which can be claimed as exempt).

The bulk of the controversy centers on the valuation issue, the eligibility issue being largely controlled by this court's decision in *In re Leva*, 96 B.R. 723 (Bankr.W.D. Tex.1989). First City says that this court should simply apply a fair market standard of valuation, consistent with the language used in both section 522 of the Bankruptcy Code ("Code") and section 42.001 of the Texas Property Code. *See* 11 U.S.C. § 522(a)(2) (1982 & Supp. IV 1986);[1] Tex. Prop.Code Ann., § 42.001(a) (Vernon Supp. 1989).[2] The debtor argues for applying a distress or liquidation valuation, in keeping with the fresh start policy of the Code and in recognition of the asserted realities of bankruptcy that, if the property is not retained by the debtor, it will realize for the estate only what the chapter 7 trustee can get for it anyway, which is generally a

---

1. "Value" means fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate.

11 U.S.C. § 522(a)(2).

2. Eligible personal property that is owned by a family and that has an aggregate fair market value of not more than $30,000 is exempt ...
Tex.Prop.Code, § 42.001(a).

liquidation price. *See In re Walsh*, 5 B.R. 239 (Bankr.D.D.C.1980).

## BACKGROUND FACTS

The evidence focused largely on the valuation issue, though some evidence regarding use and intent to use was also submitted. All of the jewelry pieces, including the 6.18 carat diamond ring, are worn regularly by the debtors (indeed, some of the pieces show a substantial amount of wear, detracting from their value). The debtors acquired all of the pieces for the purpose of wearing them, and many of the pieces included such comparatively utilitarian items as watches and earrings.

The evidence suggested mixed motives for acquiring the 6.18 carat diamond ring. On the one hand, the ring was purchased on the occasion of the Mitchells' twenty-fifth wedding anniversary. Mr. Mitchell had not been able to buy his wife much of an engagement ring when they were wed, so this was actually her first real wedding diamond. He paid in excess of $30,000 for the ring in 1978, evidently believing the ring to be a good investment at the time.[3]

Some years later, Mr. Mitchell read in a magazine that diamonds were no longer such a good investment, whereupon he began considering selling the ring before it lost much more in value. Following that article's suggestions, he used 15% of cost as the current value in his 1987 financial statements, and further devalued it when he prepared his bankruptcy schedules. He said he never tried to insure the diamond ring, largely because the insurance cost too much and the ring in any event was in many ways not replaceable.

■ These facts suggest dual motivation on the part of the debtor in the acquisition and retention of the diamond ring. The court does not believe that Mrs. Mitchell is nearly so willing to sell the ring as the debtors' expert is to buy it, representing as it does a memento of her twenty-fifth wedding anniversary. Although Mrs. Mitchell was not present in court, the bank's officer acknowledged that both Mr. and Mrs. Mitchell had, long before bankruptcy, attested that she always wears the ring. That it is not insured strongly suggests that insurance would do little to replace the sentimental value Mrs. Mitchell attaches to the ring. No doubt Mr. Mitchell used the ring to support his financial statement in previous years, but this court does not believe that represents a primarily investment-type intent. The court finds the testimony regarding use and intent to be credible and believes that, notwithstanding a clear investment purpose, expressed in both the size of the diamond and the testimony of Mr. Mitchell, other factors, such as continuous wear and sentimental attachment, carry considerable weight sufficient to qualify the ring as "clothing reasonably necessary for the family." Tex.Prop.Code Ann., § 42.002(3)(C); *Fernandez v. Seidler* (*In re Fernandez*), 855 F.2d 218, 221 (5th Cir.1988); *In re Leva*, 96 B.R. 723 (Bankr. W.D.Tex.1989); *In re Reed*, 89 B.R. 603 (Bankr.N.D.Tex.1988).

The valuation testimony differed dramatically. First City's expert assigned an "estate value"[4] to the 6.18 carat diamond ring, of approximately $6800.00 per carat, or $42,024.00. He gave the ring a fair market value of $36,000.00. The debtors' expert (the same man who wanted to buy the ring and who had also originally sold it to Mr. Mitchell) said that, in situations such as this, where the debtor had to sell, he would offer no more than $7,800.00 for the ring, as that would take into account the risk he would be taking in trying to re-market the ring to someone else. The latter value represented little or no "holding period" while the former assumed a reasonable exposure to the market of a period of months. The court finds both witnesses' testimony credible insofar as they are consistent with an assumed valuation standard, leaving the

---

**3.** The person who sold it to him was present at the bankruptcy hearing, ready to buy it back for just over $7,000.

**4.** The estate value is what a jewelry company would have to pay on the diamond market to acquire the stone, as opposed to the retail market, which is what one would ask the customer to pay for the item.

court to decide which valuation standard should be adopted.

The debtors will be hard-pressed to keep the 6.18 carat diamond ring should this court find that the fair market valuation standard controls. The debtor has already claimed household goods worth $12,000.00 (by stipulation, which this court accepts), other jewelry of $4,500.00, other clothing of $1,000.00, and the cash surrender value of a life insurance policy ($30,857.00). If the diamond ring is indeed worth $36,000.00, the debtors will be forced to choose between the ring and their household furnishings.[5]

The argument advanced in favor of the fair market valuation standard ("FMV") is that both the state and federal exemption statutes expressly stipulate to that standard. *See* notes 1 and 2, *supra; see also, Windfelder v. Rosen (In re Windfelder)*, 82 B.R. 367, 372 (Bankr.E.D.Pa.1988) (citing numerous cases); *Swink v. Henderson (In re Henderson)*, 33 B.R. 149, 150 (Bankr.D.N.M.1983) (citing numerous cases). While section 506(a) in general directs a court to value property in light of the intended purpose of the valuation process and the intended use of the property, section 522(a) *expressly* directs that, for purposes of the exemption statutes, value *means* fair market value. 11 U.S.C. §§ 506(a), 522(a)(2) (1982 & Supp. IV 1986); *In re Henderson, supra.* When Texas courts use the term, in a variety of different contexts, they generally mean it in its generally accepted sense (willing buyer, willing seller, reasonable exposure to market). *Wendlandt v. Wendlandt*, 596 S.W.2d 323, 325 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ) (divorce action); *Senters v. State*, 291 S.W.2d 739, 740 (Tex. Crim.App.1956) (criminal case); *West Texas Hotel Co. v. City of El Paso*, 83 S.W.2d 772 (Tex.Civ.App.—El Paso 1935, writ dism'd) (tax suit); *see Transwestern Pipeline Co.*

*v. O'Brien*, 418 F.2d 15, 17 (5th Cir.1969) (condemnation action).

The debtor appeals to logic, public policy, and practicality. The most elegant expression of the argument is found in *In re Walsh*, noted above. There, then Bankruptcy Judge Roger Whelan, after acknowledging the express language of the statute, fled to the panoply of canons of statutory construction for relief from the plain meaning of the statute. Here is what Judge Whelan argued:

> Thus, in construing the meaning of the definition of value in Section 522, the Court must look to the usual and accepted meaning of "fair market value," *while taking into consideration the liquidation context and the goals of the Code as a whole.* ... In ascertaining fair market value, "there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in bargaining." [citations omitted]. ... The definition is "not invariable," but "varies with the circumstances surrounding a given object and situation to which it is sought to apply the term." [citation omitted]. ...
>
> .  .  .  .  .
>
> Inasmuch as the purpose of valuation under the exemption provisions is ultimately to determine whether such property is subject to liquidation by the trustee because it is in excess of specified monetary amounts, the Court believes that the term "fair market value," as it is used to define "value" in Section 522, must be interpreted in the liquidation context in a Chapter 7 case.

*In re Walsh*, 5 B.R. 239, 241 (Bankr.D.D.C. 1980) (emphasis added).

Judge Whelan then added, as illustration, that using fair market value in the traditional sense only hurts the debtor without augmenting the return to creditors. In his example, a debtor claiming the federal ex-

---

**5.** First City points out that, even at the debtors' values, the exemptions claimed exceed the $30,-000 cap by $26,157.00. The cash surrender value of the life insurance policy thus also falls victim to First City's objection. The cash surrender value of the insurance policy is not ex-

empt under Tex.Ins.Code Ann. § 21.21 (Vernon Supp.1989), and therefore must be counted under the "cash surrender value of life insurance" category, making its retention subject to the $30,000 cap. *In re Brothers*, 94 B.R. 82, 3 T.B. C.R. 180 (Bankr.N.D.Tex.1988).

emption asserted an auto to be worth $1,200.00, though its "FMV" might be $2,000.00. The court orders a trustee's sale, because of the equity present, but the trustee is only able to fetch a liquidation price—$1,200.00. The creditors have realized nothing. Meanwhile, the debtor is out the car. The debtor gets the money back (*see* section 522(d)(2)), but is unable to buy another car, because cars are not selling *retail* for less than $2,000.00. *Walsh*, 5 B.R. at 242, n. 3.

It is technically incorrect to say that *Walsh* favors the use of a liquidation valuation *per se.* The case instead encourages a focus on the applicable *market* when one speaks of "fair *market* value." Urging that the applicable market is the one available to a bankruptcy trustee, the values generated in that market will reflect the sale circumstance by being somewhat depressed.

There are a number of difficulties with this position, however. The argument is essentially circular and turns the generally accepted definition of fair market value on its ear. An essential component of fair market valuation is a reasonable holding period, the antithesis of *Walsh's* "liquidation" market. *Nellis v. Rosenbaum (In re Nellis)*, 12 B.R. 770, 772 (Bankr.D.Conn. 1981).[6] A market is a setting in which buyers and sellers can deal with each other conveniently. Bradley, *Macroeconomics,* p. 39, (University of Maryland Press 1980). *Walsh's* liquidation scenario eliminates the convenient market, and by definition fails to reflect what the commodity is in fact worth. By focusing on "market," *Walsh* ignores the "fair" in fair market value.

There should simply be no such thing as a "bankruptcy market" when it comes to fair market value, especially insofar as the holding period is concerned. The directive to find fair market value compels the fact finder to act as though there were no bankruptcy. In an analogous context, that of

condemnation proceedings, the Texas Supreme Court has said:

> In determining the landowner's just compensation for what is taken from him, the fact finder is entitled to consider every factor affecting the price which the prudent and willing buyer and seller would exchange for the property. Some realities, however, must be excluded from the computation, which means that the exercise becomes to some extent hypothetical. The willingness and ability of buyer and seller are assumed. *The fact of condemnation itself is excluded;* fair market value must, by definition, be computed as if there were no proceedings to eliminate that market. By virtue of the hypothetical exercise, the courts could add an increment of project enhancement to the market up to the time of taking by simply decreeing it. To do so would add an artificial increment and place the landowner in a better position than he would have enjoyed had there been no construction or condemnation. The objective of the judicial process under the constitution and statutes is to make the landowner whole and to award him only what he could have obtained for his land in a free market.

*City of Fort Worth v. Corbin,* 504 S.W.2d 828, 830–32 (Tex.1974) (emphasis added).

Debtors implicitly argue that, for purposes of valuation, the universe of buyers for the jewelry item should be limited to those individuals who are interested only because of the bankruptcy. The Bank would expand that universe. Debtor's expert said that "in situations such as this, where the debtor had to sell, he would offer no more than $7,800.00 for the ring, as that would take into account the risk he would be taking in trying to re-market the ring to someone else." In fact, however, the debtors do not have to sell the ring. Indeed, if they do, perhaps it is not held for an *exempt* purpose after all. What this expert really means is: "Because I assume you are selling now and because there are

---

**6.** "what can be realized out of the assets *within a reasonable time* ... at the regular market value, conceiving the latter as the amount which could be obtained for the property in question

*within such period ....*" *Nellis,* 12 B.R. at 772, *quoting* 2 *Collier on Bankruptcy,* para. 101.31[5] (15th ed.1980).

only a limited number of buyers now for your diamond, this is how much I will pay for your diamond. If you were to extend your decision to sell beyond this point when more buyers could enter the market for your diamond, I might have to reevaluate my position at that time." The "fair" in fair market value demands that there be a reasonable time in a reasonable universe for buyers and sellers for goods of this type.

There is also another (and what I consider to be a more fundamental) difficulty with the *Walsh* position, and that is that it is out of step with what I conceive to be the overriding function of the "cap" which Texas places on personal property exemptions. Section 42.002 of the Property Code sets out what Texas finds to be the "approved list" of items which Texans should be allowed to retain, no matter how much they owe creditors. Some of these items assure the survival of the individual or the family in some station above abject poverty.[7] Thus, we will not let creditors take away the debtor's means of transportation in this, the largest state among the lower forty-eight. Nor will we allow the farmer debtor to be deprived of the means with which to restart his herd (a bull and five cows, with calves). The debtor will be permitted to keep food, clothing, furniture, and the means of livelihood (to the extent directly related and essential to the profession or trade). In addition, Texas protects the dignity of its citizens, and seems to uphold a certain ethos in its exemption laws. A Texan should be allowed to keep

two firearms, for example. Athletic and sporting equipment is on the list of protected items (musical instruments are not). Among the specific means of travel sanctioned by Texas' exemption law are both passenger cars and light trucks (this would include pickup trucks), if not used for the production of income. If used for income production, a Texan can also keep two horses (with saddle and bridle for each), or a pickup truck, or a camper truck.

In short, Texans cannot simply keep $30,-000.00 worth of anything they want. Instead, they must pick items off an approved list of items which, according to the legislature, are the sort of things sufficiently important for a Texas debtor to keep regardless of the claims of creditors. *See* note 9, *supra*. Once debtors have "gone shopping" from this approved list and picked out what they want to keep, however, they must "go to the checkout line," as it were, to see how much can actually be "purchased" out of the "budget" allowed by the Texas Legislature in section 42.001(a) of the Property Code. This second step in the process balances out the competing concerns of assuring a debtor a fresh start and assuring creditors a fair recovery on their legitimate claims.[8] Letting the debtor have everything off the approved list without limitation offends the sensibilities of the common man (and woman) whom the legislature represents. The cap prevents abuse and overreaching by unscrupulous debtors who would borrow with impunity, then "thumb their noses" at their creditors.[9] The values which com-

---

7. Our exemption laws attempt to strike a balance between the rights of creditors and the survival of debtors. They do not assure the preservation of a debtor's station in life, but rather act as a "safety net" to prevent debtors and their families from being left destitute, wards of the state as a result of creditor collection activity. *Leva*, 96 B.R. at 728. Exemptions are in fact a limit on a creditor's right to satisfaction of its claim out of the debtor's assets. The limitations are imposed for reasons of public policy. There is no *public* policy served in preserving the lifestyles of the rich and bankrupt.

8. The trustee in *Fernandez* put it prosaically: "The Texas exemption laws are designed to af-

ford the debtor a fresh start, not a head start." *In re Fernandez*, 855 F.2d at 221.

9. A similar cap was in place for many years on the urban homestead, though Texas' legendary solicitude for the homestead tended to overwhelm the countervailing concern about debtors taking advantage of their creditors. The cap applied only to the value of the land, without regard to improvements, as of the date of acquisition. *Hoffman v. Love*, 494 S.W.2d 591 (Tex. Civ.App.—Dallas), writ ref'd n.r.e., 499 S.W.2d 295 (Tex.1973). The extraordinary proof problems the timing of this valuation imposed on courts led eventually to an amendment to the Texas Constitution, replacing the value limitation for urban homesteads with a size limitation (one acre).

prise the cap must, therefore, reflect fair market, not liquidation, values of the personal property sought to be claimed exempt. The Texas exemption statutes, like those of most states, are not designed to give the debtor a cache of property to sell so that the debtor can raise some cash. To the contrary, the assumption is that the debtor will *not* need to raise cash, because he or she will already have what any Texan needs to survive.[10] Liquidation from the *debtor's* point of view is thus inapposite.[11]

The use of liquidation values for purposes of arriving at the cap would tend to encourage debtors to pick the lowest possible values in order to gather up the maximum from the approved list.[12] After bankruptcy (or after the collection action has been exhausted), the debtor could then sell the items at his or her leisure, realizing their true value while the creditors watch in frustration. This result is at cross purposes with the function of the cap, i.e., to prevent abuse by overreaching debtors.

Using fair market values will not, in the main, deprive most debtors of the necessities of life, nor will it subject most debtors to any particular indignities. "In *Crisp v. Security Nat. Life Insurance Co.*, 369 S.W.2d 326 (Tex.1963), our supreme court recognized that used household goods, clothing, and personal effects have no "market value" in the ordinary meaning of that term." *Wendlandt v. Wendlandt*, 596 S.W.2d 323, 325 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ). It is only when we come to such items as 6.18 carat diamond rings that we find a market to match. Once we have a market, there is no reason not to ask what the "fair market value" of that item is. Usually, in such situations, we will not be yanking the covers off the debtor's bed or wresting the wedding band off the debtor's finger. Debtors can, if they so choose, elect to do without comforts of hearth and home if a diamond ring means that much to them. All that the statute forces debtors to do is to make the hard choice. The salutary aspects of the exemption statute are not thereby undermined while the anti-abuse aspects are vindicated.

■ For these reasons, this court joins the majority of courts in holding that "fair market value" has its generally accepted meaning as it is used in section 522(a)(2) of the Bankruptcy Code. The court further holds that the phrase again has its generally accepted meaning as it is used in Texas' personal property exemption statute, section 42.001(a) of the Texas Property Code. The appropriate valuation standard is thus "fair market value," incorporating as it does an exposure of the item to the appropriate market for a reasonable period of time.[13] In this case, the court adopts the

---

**10.** Some commentators have recommended that exemption legislation allows the debtor to claim property of any kind subject to an overall value limitation. The laws on the books, by prescribing categories of exempt property, encourage acquisitions of the kinds that qualify although not otherwise needed or wanted by the debtor. While acknowledging that such legislation often results in planning for insolvency by debtors who wish to maximize what can be kept out of the reach of their creditors, the Act rejects the view that property of a delinquent debtor should be insulated from levy up to a certain value irrespective of its nature. The Uniform Exemptions Act, like Section 522 of Title 11 of the United States Code, thus does not reflect the view that every debtor is entitled to a minimum grubstake for whatever purpose may please him. Rather the premise of this Act is that in order for a debtor's property to be protected against compulsory application to the payment of his indebtedness, it must be used, or be adaptable for use, in ways and for purposes deemed on balance to be preferable to such application. These ways and purposes have a perceived relation to the provision of shelter, clothing, and other necessities of daily living in this country.
Commentary, Uniform Exemptions Act, 13 U.L.A. 207, 209 (West 1986).

**11.** A number of courts have pointed out that the fair market value for many of these items, such as clothing, furniture, appliances, and the like, will frequently be nominal anyway. *See Wendlant v. Wendlant, infra.*

**12.** As a practical matter, that is precisely what most debtors in bankruptcy do now when they file their Schedule B–4.

**13.** This court does not need to reach the issue addressed in a number of other recent bankruptcy courts regarding whether fair market value is to be applied to the value of the items or to the value of the debtor's equity in the items. No evidence was here presented whether

fair market valuation suggested by First City's expert and finds the value of the 6.18 carat diamond ring to be $36,000.00.

The debtors are directed to file a new schedule B–4 listing their exemption claims in light of this decision. The valuations announced at trial by stipulation with respect to the furnishings are binding on both the debtors and First City and may not be further contested. The jewelry must be valued at the fair market value as set out in the appraisal prepared by First City's appraiser.[14] This decision shall constitute both the order of the court and findings and conclusions in support thereof.

So ORDERED.

there are any liens against these assets and, if so, what the amount of those lien claims might be. The court also notes that the Fifth Circuit has left the issue in some considerable confusion as a result of its decisions in *Allen v. Hale County State Bank* (*In re Allen*), 725 F.2d 290 (5th Cir.1984) and *Bessent v. United States* (*In re Bessent*), 831 F.2d 82 (5th Cir.1987). To coin a phrase, rumors of the death of *In re Allen* may be premature. *See In re Weiss,* 92 B.R. 677 (Bankr.N.D.Tex.1988); *In re Anthony,* 102 B.R. 600, 2 T.B.C.R. 280 (Bankr.S.D.Tex.1988); *see also In re Ricks,* 40 B.R. 507, 509 (Bankr.D.D.C. 1984).

14. This was the only testimony submitted on fair market value of the jewelry. The debtors may not further litigate the valuation question at this late date, having already put on their evidence and rested.