**In re Susan WATERS, Debtor.**

**Bankruptcy No. 90–30354–C.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Dec. 10, 1990.

Hal F. Morris, Scott, Hulse, Marshall, Feuville, Finger & Thurmond, P.C., El Paso, Tex., for McMahan's Furniture Co.

Jerry Tansey, El Paso, Tex., for Susan Waters.

Don Leslie, El Paso, Tex., Chapter 7 Trustee.

## DECISION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the Debtor's Motion to Redeem Tangible Personal Property with Lien. Upon consideration thereof, the court finds and concludes that Debtor is permitted to redeem the tangible personal property at a value substantially equivalent to the price yielded by a commercially reasonable sale.

## BACKGROUND FACTS

On April 2, 1990, Susan Waters ("Debtor") commenced her voluntary Chapter 7 petition. On May 3, 1990, she filed her Motion to Redeem Tangible Personal Property with Lien by Creditor, McMahan's Furniture Company, Inc. ("McMahan's"). Debtor sought to redeem various items of furniture, electronic devices and household appliances by paying McMahan's the amount of the allowed secured claim, pursuant to Section 722 of the Bankruptcy Code. 11 U.S.C. § 722. Although the Debtor's Motion stated that the value was undetermined, Debtor originally contended the value was less than $800.00. Subsequently, she revised this value down to $500.00. McMahan's filed a Proof of Claim in the amount of $2,489.10, claiming to be secured by the property in question. McMahan's requested a hearing to determine the value of this property for redemption purposes under Sections 506(a) and 722.

Part of McMahan's business includes selling used furniture. Its experts testified that the property could be resold through McMahan's for $2,000.00. One expert testified that the wholesale value of the property would be $1,000.00. When the other expert was asked at what price he would purchase the property, the expert stated that he would offer a price between $1,000.00 to $1,200.00. Debtor testified that she believed she could only recover $500.00 through a private sale. Debtor also offered the testimony of a pawnbroker who stated that he believed the property

was worth between $500.00 and $700.00, based upon the prices he could receive for generic property of this type in his business. All parties agree that the property is in excellent condition.

## DISCUSSION AND CONCLUSIONS OF LAW

Section 722 gives debtors the right to redeem certain tangible personal property from liens securing dischargeable consumer debts if the property is exempt under Section 522 or has been abandoned under Section 554, by paying the holder of the lien the amount of the allowed secured claim. 11 U.S.C. § 722. This right to redeem amounts to a right of first refusal in favor of the debtor on consumer goods that might otherwise be repossessed. The section allows the debtor to retain necessary property, avoiding the high replacement cost that might be required if the secured creditor were to repossess the property. *In re Hobdy,* 18 B.R. 70, 75 (Bankr.W.D. Ky.1982). It also discourages creditors from threatening repossession to force debtors to pay in full for otherwise worthless collateral.

■ The question here is at what price the debtor redeems under Section 722. Value is not a narrow term which can rigidly be applied under the same standard in all cases for all purposes. 11 U.S.C. § 506(a); *In re Damron,* 8 B.R. 323, 325 (Bankr.S.D. Ohio 1980). Value does not necessarily contemplate forced sale or liquidation value of the collateral nor does it always imply a full going concern value. Courts are called upon to determine value on a case-by-case basis in light of the purpose of the valuation and the proposed disposition or use of the subject property. H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6312; S.Rep.No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5854. This broad language allows courts to use a wide variety of approaches in settling on a valuation standard for redemption proceedings.

■ Whatever approach is adopted must seek to balance the competing interests of debtor and lienholder. The debtor is interested in a low valuation which would promote her retaining her household goods in furtherance of the "fresh start." Redemption focuses on freeing the debtor of burdensome debt without imposing on the debtor the high cost of replacement of these items. The secured creditor's interest lies in a high valuation in order to preserve its constitutionally protected rights arising from its security interest in the property. *See In re King,* 75 B.R. 287, 289 (Bankr.S.D.Ohio 1987); *In re Cruseturner,* 8 B.R. 581, 585 (Bankr.D.Utah 1981).

■ This is an issue of first impression for this court. Other courts have adopted one of three basic approaches to this issue: 1) the lesser of the secured claim or the fair market value of the collateral (greatest return to the creditor); 2) the liquidation value (fire sale standard); and 3) the value yielded by a commercially reasonable disposition of the property.

### The Fair Market Value

The majority of courts have approached redemption valuation by seeking out a "fair market value," though many of these cases fail to offer insight into how that fair market value is to be derived in the context of consumer property for which there is seldom a ready market. *See e.g., General Motors Acceptance Corp. v. Bell,* 700 F.2d 1053 (6th Cir.1983); *In re Fitzgerald,* 20 B.R. 27 (Bankr.N.D.N.Y.1982); *In re Hobdy,* 18 B.R. 70 (Bankr.W.D.Ky.1982); *In re Hart,* 8 B.R. 1020 (Bankr.N.D.N.Y.1981); *In re Kinser,* 17 B.R. 468 (Bankr.N.D.Ga. 1981); *In re Zimmerman,* 4 B.R. 739 (Bankr.S.D.Cal.1980); *cf. In re Mitchell,* 103 B.R. 819, 822 (Bankr.W.D.Tex.1989). A literal reading of the language of Section 722 "allowed secured claim" and the legislative history to Section 506(a) seem to form the basis for this interpretation. *See In re Fitzgerald,* 20 B.R. at 30.

This court has accorded the phrase "fair market value" as used in Texas' exemption

statute[1] its generally accepted meaning. *In re Mitchell*, 103 B.R. 819, 822 (Bankr.W. D.Tex.1989). In *Mitchell*, this court expressly rejected the notion of a "bankruptcy market" for the purpose of this definition, noting that a fair market is one in which there is a "willing buyer, willing seller, with reasonable exposure to the market." *Id.* at 822. *Mitchell* did not address redemption valuations, however, and the term "fair market value" is not found in Section 722.

The court in *Kinser* concluded that redemption under Section 722 must be for fair market value, but did not discuss how to derive that value. *In re Kinser*, 17 B.R. 468, 469 (Bankr.N.D.Ga.1981) (Norton, B.J.). Other cases have tried to define fair market value in the redemption context. When the creditor was not in the business of reselling the subject property, fair market value was found to be the wholesale value. *In re Redding*, 34 B.R. 971, 973 (Bankr.M.D.Pa.1983). Fair market value has been set at the net amount that a creditor would receive were it to repossess and dispose of the collateral as permitted under nonbankruptcy law, an approach which suggests that the appropriate market is that available to a secured creditor exercising its remedies under Section 9–504 of the U.C.C. *See In re Cruseturner*, 8 B.R. 581, 585 (Bankr.D.Utah 1981). We return to this last notion below, but on a slightly different analytical tack than that employed in *Cruseturner*.

### Liquidation Value

One court has held that fair market value in the consumer debtor context should "take into consideration the liquidation context and the goals of the Code as a whole." *In re Walsh*, 5 B.R. 239, 241 (Bankr.D.C. 1980). *Walsh* decided that fair market value "must be interpreted in the liquidation context of a Chapter 7 case." *Id.* at 241. This approach gives great weight to the equitable notion that if the value is set at a price that the debtor cannot reach then the right to redeem becomes meaningless. *In re Carroll*, 7 B.R. 907, 909 (Bankr.Ariz.

1981); *In re Clark*, 10 B.R. 605 (Bankr.C. D.Ill. 1981).

*Walsh* was rejected by this court in *Mitchell* on grounds that its approach impermissibly calls for the creation of a "bankruptcy market" for exemption "fair market" valuations. *In re Mitchell*, 103 B.R. at 822. This court sees no more reason to call such a marketplace into existence for redemption purposes. If anything, public policy militates against recognizing such a market, lest consumers be tempted to file chapter 7 bankruptcy solely to write down consumer debt to the detriment of the consumer credit industry. Consumer credit would either become prohibitively expensive (even more so than it is already) or dry up completely were such a "marketplace" to be opened up by the bankruptcy courts of this nation.

In addition, Section 722 clearly aims at balancing the competing interests of debtor and creditor. *Walsh* does not balance those interests. It tips the scales decidedly in favor of the debtor.

### Commercially Reasonable Disposition

There has developed a recent trend which uses as its touchstone for valuation the standard of commercially reasonable disposition of the property by the lender. *See In re Ridner*, 102 B.R. 247, 249 (Bankr.W. D.Okla.1989); *In re King*, 75 B.R. 287, 290–91 (Bankr.S.D.Ohio 1987); *In re Damron*, 8 B.R. 323, 325–26 (Bankr.S.D.Ohio 1980). This admittedly imprecise standard gives courts flexibility to consider not only factors affecting the property itself, such as age, condition and nature of collateral, but also tends to take into account the nature of the creditor's business and the way in which such property is normally disposed of in that business when the collateral is recovered by the creditor. The net outcome is often a middle ground between retail valuation and distressed sale valuation. *Damron*, 8 B.R. at 325.

In addition to the condition of the collateral, the court under this approach may consider the owner's opinion as to fair

---

1. Under Texas law, debtor family may retain up to $30,000 worth of personal property as exempt. Tex.Prop.Code Ann. § 42.001 (Vernon 1984).

present value, the underlying sale documents and expert opinion testimony regarding appraisals or experience in the industry. *Id.* This standard contemplates a gross sales price less costs to repair the collateral and other costs required to produce a sale. However, the standard largely ignores the circumstances of auction or forced distressed sale unless that is the only manner by which to reasonably dispose of such property. *Id.* at 325–26.

"[When] the focus is [on] retention of the asset, the valuation process should be consistent with the policy underlying such retention." *In re King,* 75 B.R. at 289. A recent decision which applied this principle to the debtor's redemption of jewelry under Section 722 evaluated the debtor's proffer of a pawn shop broker's testimony as to value. *In re Ridner,* 102 B.R. at 247. The court rejected the low valuation urged by the debtor and instead embraced the decisions of *Damron* and *King* adopting "commercially reasonable sale" (disposition) as the appropriate standard of valuation for purposes of redemption under Section 722. *Id.* at 249.

### The Applicable Standard

The *Ridner–King–Damron* approach is extremely appealing. From the view of the debtor, the standard allows her to repurchase the property at a fair price which does not impede the "fresh start." From the creditor's view, McMahan's is given the benefit of its bargain, namely a fair price reflective of the credit it would be obligated to give the debtor outside of bankruptcy by way of a commercially reasonable disposition of the collateral.

■ The lender maintains that the debtor should have to pay McMahan's what McMahan's itself could recover for the property if it were to repossess and resell the furniture, arguing that it is uniquely positioned to realize a high resale value because it regularly resells repossessed furniture. That approach fails to balance the debtor's interests into the overall calculation, focusing solely on maximizing McMahan's return. The statute's very title ("redemption"), however, emphasizes that this is a process viewed from the vantage of the debtor, who is empowered to redeem *her property* from the claim which encumbers *her* property. So long as the lender is paid its due, her property should be pronounced "free" of that claim. It is *not,* then, the lender's property with which we are concerned—only the lender's *claim* on the property.

Outside of bankruptcy, the lender would be well within its rights to repossess the property, conduct a foreclosure sale in a commercially reasonable manner, and apply the proceeds to the debt. The lender would then be free to hold the debtor responsible for the deficiency. The lender could not be compelled to hold out for a sale price any *greater* than that which it could expect to recover in a commercially reasonable disposition pursuant to Article 9–504 of the Uniform Commercial Code, however. *See* Tex. Bus. & Comm.Code Ann. § 9.504 (Vernon Supp.1990); *see also International Bank, N.A. v. Morales,* 736 S.W.2d 622, 624 (Tex. 1987); *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986) (failure to conduct commercially reasonable sale may give rise to contractual damages, but does not sound in tort). The amount yielded in such a sale best represents the lender's *legal* claim on the property. The sale price which McMahan's might be able to achieve as a result of its internal business structure may well represent McMahan's *economic* or *practical* claim on the property, but is not the number with which it would be required to credit the debtor as a matter of law upon a commercially reasonable disposition. *International Bank, N.A. v. Morales,* 736 S.W.2d at 624. The economic or practical claim is not the encumbrance from which the property must be redeemed in order to free it from the creditor's claim pursuant to Section 722, unless of course that is the number which McMahan's must credit to a debtor when McMahan's repossesses and forecloses outside of bankruptcy. Under Texas law, it is not. *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex.1982) (UCC gives creditor widest leeway in choosing whatever means of disposition he considers most

advantageous; only limits are commercial reasonableness and notice to debtor).

In determining the market applicable to valuation of this property, a court should consider the purpose for the valuation. Part of the valuation context here is that debtor proposes to keep these household goods. However, weight must also be given to the market available to the creditor, McMahan's, as that is the vantage point from which "commercially reasonable disposition" must be measured. *See Sunjet, Inc. v. Ford Motor Credit Co.*, 703 S.W.2d 285, 286–88 (Tex.App.—Dallas 1986, no writ) (burden is on secured creditor to establish that is manner of disposition was commercially reasonable). Here McMahan's is in the business of selling not only new but also used furniture and appliances. That McMahan's stands ready to recover these goods and place them in its showroom for resale easily removes liquidation value from consideration. In a wrongful foreclosure action, McMahan's might in fact be expected to prove that it had taken advantage of the resources available to it in disposing of used furniture and appliances in order to establish a commercially reasonable disposition.

By the same token, however, McMahan's maintains a large showroom and sales force, and gives a warranty on merchandise it sells, even if it is used. McMahan's also marks up resale property to achieve a profit. In addition, it offers financing.[2] Some of these factors would, under a commercially reasonable disposition standard, be justifiably subtracted from the price received as part of the cost of sale. *See* Tex.Bus. & Comm.Code Ann. § 9.504. Some adjustment must therefore be made to the valuations proposed by McMahan's to derive the price likely to be yielded by a commercially reasonable sale *net* of these expenses.

McMahan's testified that, were it to agree to sell the furniture in question on consignment for the debtor, it would reasonably expect to turn over approximately $1,200 net to the debtor after deducting the commission. This number more closely reflects a "private sale" sale price net of an appropriate charge for costs of sale, and more nearly parallels the conditions of a commercially reasonable disposition of the collateral *qua* collateral.[3]

Although McMahan's *may* be able to resell the property at a price of $2,000.00, this court is not persuaded that the standard should be what gross price could be brought by McMahan's disposition. The "commercially reasonable sale" approach is objective, as it should be. Asking what price a particular creditor could receive if it were to resell the property itself does not tell us what any creditor in the creditor's situation would be *expected* to receive if it repossessed the property and foreclosed its security interest. Our inquiry should be fairly addressed to the reasonable price any creditor similarly situated could expect to receive in that situation.

Based on the testimony from the experts regarding wholesale value and the expert's opinion regarding the net proceeds which McMahan's might expect to yield from reselling the property on consignment, this court finds that an objective, commercially reasonable disposition of this property would result in net proceeds of $1,200.00. That is the value which this court assigns to the lender's interest in the property, and the price which the debtor must pay to McMahan's to redeem that property from that claim if she wants to have this property free of that encumbrance.

So ORDERED.

---

**2.** The evidence indicated that McMahan's real line of business might well be consumer financing. In the three years the debtor has owned the property subject to this redemption action, she has paid over $2,000 in payments, yet only $300 of that amount has been applied to principal. At McMahan's valuation, it could very well resell this property for virtually its original sale price, and again finance it, with virtually no loss of principle.

**3.** McMahan's approach to valuation ignores the restricted collateral interest it has in the property and essentially treats the furniture as McMahan's *inventory*, which just happens, unfortunately, to be in some debtor's possession.