In re Craven H. **SUMERELL** and Amy D. Sumerell, Debtors.

Bankruptcy No. 95–20727.

United States Bankruptcy Court, E.D. Tennessee.

April 12, 1996.

Fred M. Leonard, Bristol, Tennessee, for Craven. H. Sumerell and Amy D. Sumerell.

David S. Bunn, Massengill, Caldwell, Hyder & Bunn, P.C., Bristol, Tennessee, for Wachovia Bank of South Carolina.

## *MEMORANDUM*

MARCIA PHILLIPS PARSONS, Bankruptcy Judge.

This case is presently before the court upon the objection filed by Wachovia Bank of South Carolina ("Wachovia") to the debtors' claim of exemptions in certain personal property owned by them. Wachovia alleges that the exemptions should be denied because the debtors have substantially undervalued their property and have acted in bad faith by their prepetition transfers of certain assets and their failure to list these assets in their schedules. For the reasons set forth below, the court will sustain the objection with respect to the majority of the exemptions claimed by the debtor, the court having con-

cluded that the debtors have incorrectly valued their household property at liquidation value.

## I.

This joint chapter 7 case was filed by the debtors, husband and wife, on May 18, 1995.

Along with the filing of the petition, the debtors filed their required schedules and statements, including Schedule B, the List of Personal Property and Schedule C, the List of Property Claimed As Exempt. Schedule B indicated that as of May 18, 1995, the debtors had an interest in the following personal property:

| TYPE OF PROPERTY | CURRENT MARKET VALUE OF DEBTORS' INTEREST |
|---|---|
| Cash on hand | $ 60.00 |
| Checking accounts | $ 427.94 |
| Various household goods and furnishings [this listing was itemized] | $ 2,135.00 |
| Clothing | $ 200.00 |
| Jewelry [with separate appraisal list] | $ 2,165.00 |
| Mink stole, fox and full length mink, eight place settings of silverware | $ 1,700.00 |
| Three firearms | $ 50.00 |
| Office equipment (desk, three chairs and table) | $ 50.00 |
| Air conditioning unit (Fully secured) | $15,000.00 |
| IBM AT personal computer, typewriter, P 51 computer with printer, non-running riding mower, washer and dryer, VCR, wicker sofa, three chairs, coffee table and aluminum patio furniture | $ 435.00 |
| TOTAL | $21,841.00 |

All of the items of personal property set forth on Schedule B were restated and claimed as exempt on Schedule C pursuant to TENN.CODE ANN. § 26–2–102,[1] the $4,000.00 personal property exemption for individuals, TENN.CODE ANN. § 26–2–103(a)(1),[2] the exemption for reasonable and necessary wearing apparel, or TENN.CODE ANN. § 26–2–111(4),[3] the $750.00 exemption for tools of the trade. The debtors subsequently amended both Schedules B and C to add an additional checking account with a balance of $381.94, golf clubs valued at $125.00 and two dolls valued together at $35.00.[4]

1. TENN.CODE ANN. § 26–2–102 provides the following:

Personal property to the aggregate value of four thousand dollars debtor's equity interest shall be exempted from execution, seizure or attachment in the hands or possession of any person who is a bona fide citizen permanently residing in Tennessee, and such person shall be entitled to this exemption without regard to his vocation or pursuit or to the ownership of his abode. Such person may select for exemption the items of the owned and possessed personal property, including money and funds on deposit with a bank or other financial institution, up to the aggregate value of four thousand dollars debtor's equity interest.

2. TENN.CODE ANN. § 26–2–103(a)(1) states:

In addition to the exemption set out in § 26–2–102, there shall be further exempt to every resident debtor the following specific articles of personalty:

All necessary and proper wearing apparel for the actual use of himself and family and the trunks or receptacles necessary to contain same.

3. Under TENN.CODE ANN. § 26–2–111(4), the following is exempt:

The debtor's aggregate interest, not to exceed seven hundred fifty dollars in value in any implements, professional books, or tools of the trade of the debtor or the trade of a dependent of the debtor.

4. The amended Schedule C also claimed as exempt the debtors' stock in Bristol University at "No Value," but this amendment was later withdrawn.

Wachovia timely[5] objected to the claimed exemptions, as amended, asserting that the personal property values as set forth in the schedules by the debtors were not accurate and that the exemptions should be denied. Wachovia further requested that in the event the court sustained its objections as to value, that the debtors be denied the opportunity to amend their schedules to conform with the court's ruling because the debtors "have not come into this bankruptcy with clean hands and in good faith." Specifically, Wachovia asserts that the debtors failed to include in their list of assets a 47–unit apartment building known as Hampton Apartments and two automobiles, a Mercedes Benz and Cadillac, which were transferred prepetition to the debtors' adult children by Mr. Sumerell's wholly-owned corporation, Bristol University. A hearing on the objections was held and thereafter, the parties filed proposed findings of fact and conclusions of law such that the matter is now ready to be resolved by the court. The following represents the court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(B).

## II.

■ Fed.R.Bankr.P. 4003 sets forth the procedures with respect to exemptions and any objections thereto and provides that "in any hearing [on objections to exemptions] the objecting party has the burden of proving that the exemptions are not properly claimed." Fed.R.Bankr.P. 4003(c). Such burden is by a preponderance of the evidence. *In re Shurley*, 163 B.R. 286, 291 (Bankr.W.D.Tex.1993). Accordingly, Wachovia has the burden of proving that the debtors are not entitled to the exemptions they have claimed.

5. The debtors asserted in their response to the Wachovia objections that the objections were untimely, having not been filed within 30 days of the first date set for the meeting of creditors as required by Fed.R.Bankr.P. 4003. On September 29, 1995, this court entered an order finding the objections timely, the initial objection having been filed on the 30th day after the § 341 meeting and the objection to the Amended Schedule of Exempt Property having been filed 12 days after the amendment.

## III.

The court will first address Wachovia's assertion that the debtors have substantially undervalued their assets. Specifically, Wachovia alleges that the household goods and furnishings listed in Schedules B and C as having a collective value of $2,135.00, actually have a fair market value of $27,405.00 based on the appraisal conducted by Wachovia's expert. The wide disparity between the two amounts is attributable in part to the fact that different valuation methods were applied by the parties. The values set forth in the schedules were based on the debtors' opinion of the furnishings' "liquidation value,"[6] while the value asserted by Wachovia is said to be based on "fair market value," as that term is generally understood.

Testifying at trial as to value was Wachovia's expert, Kimball Sterling, a Johnson City appraiser and auctioneer, the debtors' expert, Rex Davis, and debtor Amy Sumerell. Mr. Sterling stated that he was in the business of evaluating and selling used furniture, antiques, and entire contents of homes and had done so for numerous years. He testified that he frequently testifies as an expert appraiser and has handled numerous estate auctions including that of the late Alex Haley, the noted Pulitzer Prize winner. Based on his examination of the debtors' household furnishings, Mr. Sterling concluded that the collective fair market value of the furnishings, within ten percent, was $27,405.00. Mr. Sterling testified that he based this amount on what he thought he could sell the items for at an auction with three weeks advertising, and was so confident that he could obtain this price at auction that he was willing to immediately purchase all of the items included in the appraisal for $19,700.00.

6. It must be noted that Schedules B and C are based on Official Form No. 6, which require that the "current market value of debtor's interest in property" be listed. Fed.R.Bankr.P. 1007(b)(1) provides that the debtor "shall file schedules of assets and liabilities ... prepared as prescribed by the appropriate Official Forms." As set forth subsequently in this memorandum opinion, the debtors explain the difference in their valuation with the value requested in the schedules by asserting that liquidation value is fair market value in "a liquidation context."

Rex Davis, the debtors' expert, testified that he was in the retail furniture business, having worked for retail furniture stores for the past 32 years, with primary responsibility as vice-president and general manager for the stores' purchases. In this capacity, Mr. Davis had also bought, sold and traded used furniture and within the past week, had been involved in attempts to sell bankruptcy estate furniture. Mr. Davis testified that he had inspected the debtors' household furnishings, that the majority of the furniture was in the medium price range and that the total value of the furniture from a retail or a manufacturers' suggested retail standpoint was $19,850.00. He opined that if the furniture were liquidated over a quick period of time, "you'd be lucky to get 20¢ on the dollar which would be approximately $3,900.00," and when asked if he thought this was a "fair market value" for used furniture, responded that it was "for used furniture and being able to dispose of it pretty quick. I really can't say that you could expect much more than that." On cross-examination when asked his opinion as to the "true value" of the furniture, Mr. Davis testified that he thought the furniture would be worth around 20¢ on the dollar on a quick sale.

Mrs. Sumerell testified that since the filing of the schedules, she had revised her estimation of the value of the household goods and furnishings from $2,135.00 to $3,460.00 based on the actual invoices for many of these items of furniture, the majority of which were purchased more than 15 years ago. Using these invoice prices, Mrs. Sumerell estimated the furnishings' present value and then reduced it by 80% to arrive at the goods' "wholesale" price, which totaled $3,460.00.

## IV.

11 U.S.C. § 522 governs the exemptions available to a debtor in a bankruptcy case and provides that the debtor may elect certain specified federal exemptions set forth in subsection (d) of § 522 or the exemptions available to a debtor under applicable state law, unless the state has opted out of the federal exemptions. *See* 11 U.S.C. § 522(b)(1). Tennessee, along with numerous other states, has opted out of the federal bankruptcy exemption scheme, making the federal exemptions unavailable to a debtor who resides in Tennessee. *See* TENN.CODE ANN. § 26–2–112; *In re Haga*, 48 B.R. 492 (Bankr.E.D.Tenn.1985).

The debtors have claimed their household goods and furnishings exempt pursuant to the provisions of TENN.CODE ANN. § 26–2–102 which provides that "personal property to the aggregate value of four thousand dollars ($4,000.00) debtor's equity interest shall be exempt...." Unlike § 522 of the Bankruptcy Code which defines value for purposes of that section as "fair market value as of the date of the filing of the petition,"[7] TENN.CODE ANN. § 26–2–102 does not define value and no provision of the Tennessee Code supplies a definition of "value" for purposes of this section. It is noteworthy that all the Tennessee exemption statutes that speak in terms of limiting the applicable exemption to a fixed dollar amount use the single word "value" rather than some variation thereof,[8] but again, none indicate what is meant by the word "value." This court has been unable to locate any reported decision defining "value" as used in these state exemption statutes, although various courts in establishing value for purposes of these statutes have treated value as synonymous with "fair market value" or have referred to or utilized the phrase in their analysis. *See Frazier v. Frazier*, 221 Tenn. 705, 430 S.W.2d 655 (1968), *on remand*, 63 Tenn.App. 1, 468 S.W.2d 322 (1970); *Keen v. Alexander*,

7. *See* 11 U.S.C. § 522(a)(2): "In this section—'value' means fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate."

8. *See* TENN.CODE ANN. § 26–2–102 [*supra*, n. 1] ("personal property to the aggregate value . . . up to the aggregate value"); TENN.CODE ANN. § 26–2–

111(4) [*supra*, n. 2] ("The debtors' aggregate interest, not to exceed [amount] in value...."); TENN.CODE ANN. § 26–2–301 ("The aggregate value of such homestead exemption shall not exceed five thousand dollars ($5,000).... [The] aggregate value of which exemption combined shall not exceed seven thousand five hundred dollars ($7,500)....")

195 Tenn. 564, 260 S.W.2d 297 (1953) (courts used term "fair market value" in discussion of extent of debtor's personal property exemption); *Nunley v. The Paty Co. (In re Nunley)*, 109 B.R. 784 (Bankr.E.D.Tenn. 1990); *In re Crowell*, 53 B.R. 555 (Bankr. M.D.Tenn.1985); *Durham v. Montgomery (In re Durham)*, 33 B.R. 23 (Bankr. E.D.Tenn.1983); *Modern Supply Co. v. Lee (In re Lee)*, 21 B.R. 774 (Bankr.E.D.Tenn. 1982) (court's determination of whether debtors had equity in their home such that they could avoid a judicial lien as impairing their homestead exemption included consideration of home's "fair market value"); *Dickenson v. Penland (In re Penland)*, 34 B.R. 536 (Bankr.E.D.Tenn.1983) (court referred to property's "fair market value" in ruling on debtor's homestead exemption claim).

Assumably because § 522 of the Bankruptcy Code specifically defines value for exemption purposes as fair market value, the debtors concede that fair market value is the appropriate standard, appropriately noting that the Sixth Circuit Court of Appeals, albeit *in dicta*, has endorsed the fair market value standard. *See G.M.A.C. v. Bell (In re Bell)*, 700 F.2d 1053, 1055 (6th Cir.1983) (discussion of value for redemption purposes). The debtors note, however, that § 522 does not further define the phrase "fair market value" and gives no guidance as to how it should be determined. The debtors assert that there is a split of authority between the different jurisdictions as to the definition of fair market value and maintain that the phrase should be interpreted in a liquidation context, citing *In re Walsh*, 5 B.R. 239 (Bankr.D.C.1980).

In *Walsh*, as in the present case, the issue was what standard of valuation should be applied to property claimed as exempt by a debtor under 11 U.S.C. § 522. The court recognized that the usual and accepted meaning of fair market value was that set forth in BLACK'S LAW DICTIONARY which "assumes agreement between owner willing but not obligated to sell for cash and buyer desirous but not compelled to purchase." *Id.* at 241, *citing* BLACK'S LAW DICTIONARY 716 (4th ed. 1968). The court observed, however, that the definition is "not invariable" but "varies

with the circumstances surrounding a given object and situation to which it is sought to apply the term." *Id., quoting John W. McDougall Company v. Atkins*, 201 Tenn. 589, 301 S.W.2d 335, 337 (1957). Concluding that the courts have construed fair market value in the context in which the valuation question arose, the *Walsh* court held that fair market value, as it is used to define "value" in § 522, must be interpreted in the liquidation context in a chapter 7 case "inasmuch as the purpose of valuation under the exemption provisions is ultimately to determine whether such property is subject to liquidation by the trustee because it is in excess of specified monetary amounts." *Id.*

Despite the debtors' characterization of a "split of authority" on this issue, *Walsh* is the only case wherein this contextual approach to evaluation of exemptions has been directly applied. *Cf., In re Ricks*, 40 B.R. 507, 509 (Bankr.D.C.1984) (*in dicta*, court cited *Walsh* with approval in resolving issue of whether value is limited to equity interest). Since the *Walsh* decision was rendered in 1980, more than half a dozen courts have considered the issue of the appropriate valuation standard for § 522 purposes. All have rejected *Walsh* by name and have concluded that value should be measured by the traditional concept of fair market value, the amount the debtor would receive from a voluntary and willing buyer if the debtor were not under a compulsion to sell, rather than a hypothetical liquidation. *See In re Mitchell*, 103 B.R. 819 (Bankr.W.D.Tex.1989); *Windfelder v. Rosen (In re Windfelder)*, 82 B.R. 367 (Bankr. E.D.Penn.1988); *In re Allen*, 44 B.R. 38 (Bankr.D.N.M.1984); *In re Frazier*, 33 B.R. 175 (Bankr.D.Md.1983); *Swink v. Henderson (In re Henderson)*, 33 B.R. 149 (Bankr. D.N.M.1982); *Nellis v. Rosenbaum (Matter of Nellis)* 12 B.R. 770, 772 (Bankr.D.Conn. 1981). *See also In re Penick*, 170 B.R. 914 (Bankr.W.D.Mich.1994) (rejecting *Walsh* in determining value for redemption purposes under § 722 as inequitably favoring the debtor and arguing that it would create a new "bankruptcy market" specifically for redemption and exemption purposes).

The most thorough discussion of this issue is that presented by Judge Clark in *In re*

*Mitchell*, 103 B.R. at 819. Judge Clark noted that in effect, *Walsh* was urging that the applicable market when one speaks of fair market value is the market available to a bankruptcy trustee and that the values generated in that market will reflect the sales circumstances by being somewhat depressed.

There are a number of difficulties with this position, however. The argument is essentially circular and turns the generally accepted definition of fair market value on its ear. An essential component of fair market valuation is a reasonable holding period, the anti-thesis of *Walsh*'s "liquidation" market. *Nellis v. Rosenbaum (In re Nellis)*, 12 B.R. 770, 772 (Bankr.D.Conn. 1981)....

There should simply be no such thing as a "bankruptcy market" when it comes to fair market value, especially insofar as the holding period is concerned. The directive to find fair market value compels the fact finder to act as though there were no bankruptcy.... [F]air market value must, by definition, be computed as if there were no proceedings to eliminate that market.

*Id.* at 822.

■ This court is persuaded by the reasoning and the analysis of *Mitchell* and the majority cases and specifically rejects *Walsh*. Both *Walsh* and the debtors are incorrect in stating that the purpose of valuation under the exemption provision is to aid the trustee in determining whether there is property available to the estate for liquidation. While the values set forth in the schedules may be ultimately used by the trustee for that purpose, the primary purpose of the valuation is to determine that the values do not exceed the monetary limits placed on the exemptions by Congress or, as in this case, the Tennessee legislature. To allow liquidation value rather than fair market value would disregard the "cap" which the legislature has placed on personal property exemptions. As stated by Judge Clark in *Mitchell:*

The use of liquidation values for purposes of arriving at the cap would tend to encourage debtors to pick the lowest possible

values in order to gather up the maximum from the approved list.[9] After bankruptcy (or after the collection action has been exhausted), the debtor could then sell the items at his or her leisure, realizing their true value while the creditors watch in frustration. This result is at cross purposes with the function of the cap, *i.e.*, to prevent abuse by overreaching debtors.

*In re Mitchell*, 103 B.R. at 824.

■ Such a result would also ignore that the purposes of the exemptions are (1) to give the debtors a so-called "grub-stake" to begin their fresh start and (2) to act as a safety net, so that the debtor and his family are not completely impoverished due to creditor collection action or bankruptcy such that they become wards of the state. 3 COLLIER ON BANKRUPTCY ¶ 522.02 (15th ed. 1995); *Prater v. Reichman*, 135 Tenn. 485, 187 S.W. 305 (1916) (the public policy underlying the exemption statutes is to restrain a creditor from satisfying his debt out of certain kinds of property which are necessary for the maintenance of the debtors and their families); 13 TENN.JURIS. *Exemptions from Execution and Attachment* § 3 (1984), n. 10 *citing Lisenbee v. Holt*, 33 Tenn. (1 Sneed) 42 (1853) ("It was thought better and more in accordance with humanity and the interest of the state, that creditors should lose their just claims to that extent, than that the wives and children of unfortunate debtors should be reduced to entire destitution, and possibly become a charge to the community."). The assumption underlying the exemption statutes is that these purposes will be achieved by a debtor retaining rather than liquidating the exempt property as shown by the fact that the exemptions are for the most part designed to preserve the basic necessities for daily living—clothing, shelter, a minimal amount of personalty, and tools of the trade. Accordingly, from a debtor's point of view, liquidation of exempt property is inapposite. *See In re Mitchell*, 103 B.R. at 823.

■ For these reasons, this court holds that fair market value as used in § 522(a)(2) of the Bankruptcy Code has its generally

---

**9.** Judge Clark observed that as a practical matter, most debtors in bankruptcy do precisely that

when they file their schedules. *In re Mitchell*, 103 B.R. at 824, n. 12.

accepted meaning which assumes the voluntariness of the sale and incorporates an exposure of the items to the market for a reasonable period of time without consideration of the bankruptcy context in which the valuation is being made. One of the most succinct expressions of that standard is that set forth by a bankruptcy court in Ohio as the "price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree after the property has been exposed to the market for a reasonable amount of time." *In re Markowitz Building Co.*, 84 B.R. 484, 487 (Bankr.N.D.Ohio 1988); *see also Stein Construction Co. v. King*, 643 S.W.2d 329, 330 (Tenn.1982) ("Generally speaking, fair market value constitutes the amount a willing buyer will pay a willing seller for a specific product.").

## V.

■ The debtors make the further argument that in determining fair market value, there must be a reduction for hypothetical costs of sale. Mr. Sterling testified that if he were to auction the debtors' household goods and furnishings, his costs would run anywhere from 14% to 35% depending on the size and location of the sale and the requirements of the seller, with his average cost about 25% of the gross sales. The debtors argue that any fair market value determined by this court should be reduced not only by such costs of sale, but also sales tax and a trustee's statutory commission, asserting that the estate would not realize these sums if the subject property were liquidated.

■ Again, the debtors are inappropriately applying liquidation considerations to a non-liquidation valuation. As stated above, the amount the estate would receive in a hypothetical liquidation is not the appropriate standard for determining fair market value for exemption purposes. By definition, in

10. The *McClurkin* court phrased the issue before it as "whether, in valuing a creditor's secured claim, costs of sale must be deducted from the *fair market value* of the collateral even though the debtor proposes to retain the property." *In re McClurkin*, 31 F.3d at 402 (emphasis supplied).

11. The exact language of 11 U.S.C. § 506(a) is as follows:

claiming property as exempt, a debtor is proposing that he or she be allowed to retain the property rather than have the property liquidated. Therefore, cases which have considered the issue of valuing property for § 522 purposes have refused to deduct transaction costs in the valuation process, concluding that because no transaction costs are contemplated, none may be deducted. *See In re Windfelder*, 82 B.R. at 372; *Anderson v. Lucidore (In re Anderson)*, 68 B.R. 313 (Bankr.W.D.Penn.1986); *Clendennen v. Equibank (In re Clendennen)*, 67 B.R. 909 (Bankr.W.D.Penn.1986); *In re Rehbein*, 49 B.R. 250 (Bankr.D.Mass.1985); *Matter of Nellis*, 12 B.R. at 772. *See also Hunter Press, Inc. v. Connecticut Bank & Trust Company*, 420 F.Supp. 338, 343 (1976) (court held that for purposes of construing the term "fair valuation" under the Bankruptcy Act, costs of sale should not be subtracted from the market price).

■ Although the Sixth Circuit Court of Appeals has not specifically ruled on this issue in the exemption context, it has held that in establishing the value of a creditor's collateral when the property is being retained by the debtors, deduction for purely hypothetical costs of sale is neither required nor permitted. *See Huntington National Bank v. Pees, (In re McClurkin)*, 31 F.3d 401 (6th Cir.1994). At issue in *McClurkin* was the proper valuation of a secured claim pursuant to the provisions of 11 U.S.C. § 506(a) and whether such valuation should exclude hypothetical sales costs.[10] Section 506(a) of the Code provides that an allowed claim of a creditor secured by a lien on property has a secured claim to the extent of the value of the property and has an unsecured claim for the balance, with the value to be determined in light of the purpose of the valuation and the proposed disposition or use of the property.[11] The Sixth Circuit concluded that

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest

where the debtor is retaining the property, deducting purely hypothetical costs of liquidation from the value of the property would give the creditor something less than value and therefore would not be permitted. *Id.* at 404.

Although the present case involves valuation of property for exemption purposes rather than a valuation of the extent of a secured creditor's interest in property, the same reasoning applies. In both situations, the debtor is retaining the subject property, no liquidation will occur and thus no costs of sale will result. Accordingly, it would be inappropriate to reduce the value of the property by costs of liquidation which are purely hypothetical.

## VI.

■■■ This court having determined that value for purposes of 11 U.S.C. § 522 means fair market value as that term is generally understood without any deduction for hypothetical costs, the court must determine the fair market value of the property in which the debtors are claiming their exemptions. The only testimony as to the fair market value of the debtors' household goods [12] and furnishings was that presented by Kimball Sterling, Wachovia's expert, who opined that the fair market value of the subject property was $27,405.00. Mr. Sterling defined fair market value as "when a willing seller and a willing buyer can meet together and can negotiate a price of what something is actually worth—what they are willing to pay for it," and based his appraisal on what he could receive at auction after three weeks advertising. Clearly, Mr. Sterling utilized the appropriate standard because his definition assumed a non-compulsory sale after a reasonable exposure to the market. Contrarily, Rex Davis, the debtors' expert, made his determination of value in a liquidation context, defining value as what he could obtain on a "quick sale." Similarly, Mrs. Sumerell's valuations were based on "wholesale price," 20% of what she thought her household furnishings were actually worth.

Notwithstanding the appropriate standard, the debtors seek to discredit the appraisal conducted by Mr. Sterling. They assert that the values placed by him on the furnishings are not reasonable because the majority of their furniture is at least 15–20 years of age and is well used [13] and the values opined by Mr. Sterling in most cases exceed the items' original purchase prices.

■■■ While purchase price is relevant if the purchase were close in time to the determination of value, purchase prices of sales that occurred 15–20 years ago are only remotely relevant to today's market value. *Cf. Matter of Reynolds*, 17 B.R. 489 (Bankr. N.D.Ga.1981) (the more recent the purchase, the greater the relevancy of purchase price to current market value). And, while in the debtors' eyes their furnishings may be well-worn and of little value, in Mr. Sterling's observation the debtors' furniture is "premier secondary market items" and "the kind of stuff that today's young married people are looking for." The court found Mr. Sterling extremely knowledgeable and credible regarding the current market for antique reproductions, used furniture, antiques and col-

---

or the amount so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

12. Truly, Mr. Sterling's testimony was the only evidence before the court as to the value of the debtors' household goods, *i.e.*, the non-furniture items in a home such as dishes, china, glassware, pots and pans, rugs, ordinary flatware, small appliances, lamps, non-family pictures and frames, books, knick-knacks, collectibles and other odds and ends commonly found in a home. These items were conspicuously absent from the debtors' Schedules B and C. At the hearing, Mrs. Sumerell explained that she did not list these goods because she thought they had little or no value to anyone but the debtors.

13. Accordingly to Mrs. Sumerell, there were two items listed in the appraisal which were not only well-worn, but also broken, specifically a federal-style chair and one doll. There was no evidence elicited from Mr. Sterling indicating that he was not aware of the condition of these particular items at the time he conducted his appraisal. Because appraisals are by definition based on the item's "as is" condition, the court must assume that Mr. Sterling was aware of the condition of these items when he appraised them.

lectibles such as that owned by the debtors. Mr. Sterling's confidence as to his valuation of the debtors' goods was exemplified by his offer to immediately purchase the appraised items for $19,700.00. This testimony was extremely persuasive as to value, as it is obvious that someone in Mr. Sterling's line of work would not make such an offer without the expectation that the items can be resold at a significant profit. Accordingly, with the exceptions discussed below, this court concludes that the fair market value of the items appraised by Mr. Sterling are the values listed by him in his appraisal wherein he sets forth with detail each item appraised by him and its value.

■ The debtors contend that certain items listed in Mr. Sterling's appraisal should be excluded because they belong to the debtors' two adult children who live with the debtors.[14] Specifically, the debtors maintain that Mr. Sterling improperly included in his appraisal furnishings which belong to the debtors' daughter, consisting of all of the items in the "Twin Bedroom," excluding the twin beds, and the majority of the furniture listed in the "Bedroom," i.e., a Victorian bed, one wicker chair, a Bible table, an early cradle, one of seven dolls [15] and a quilt. The debtors further assert that certain of the "Basement" items listed on the appraisal, an Empire Chest, Queen Anne computer table, desk and Lanier copier, belong to their son, Patrick.

Mr. Sterling testified that he included in his appraisal all of the goods and furnishings which he found within the debtors' house with the exception of certain items in the basement and an exercise machine in the upstairs master bedroom which Mr. Sumerell identified during the appraisal as belonging to his son. Mr. Sumerell, on the other hand,

testified that Mr. Sterling ignored the information that some of the basement items (the only items mentioned by name were a copier and exercise equipment) belonged to the debtors' son and nevertheless included the items in the appraisal. There was no testimony, however, that Mr. Sterling was ever advised that the debtors did not own the "Bedroom" and "Twin Bedroom" items that the debtors now assert belong to their daughter Missy.

Wachovia contends that the debtors should be estopped from asserting that these disputed items are their children's. Wachovia observes that these items were found in the debtors' home and the debtors did not indicate in their statement of financial affairs that they were holding property for any other person.[16] The debtors explained their statement of financial affairs' answer at trial by stating that they did not understand the terminology used in the question and did not consider that they were "holding" this property for their children because their adult children also live in the house.

With respect to the cradle, the quilt and the Lanier copier, an examination of Schedules B and C indicate that these items were not listed in these schedules and thus have not been claimed in this bankruptcy as belonging to the debtors and exempt. Because the debtors have asserted no ownership interest in these items and have correspondingly not claimed them exempt, they should properly be excluded from Mr. Sterling's appraisal. The court finds it plausible that the debtors might not think of items belonging to their children that live with them when asked if they were "holding" property for some other person. Accordingly, the court is not persuaded that the debtors should be es-

---

14. According to the debtors' testimonies, the debtors have a 20 year old daughter named Missy and a 30 year old son named Patrick. Patrick Sumerell testified that he lives in the basement of his parents' home. Missy Sumerell, however, is a full-time college student living on the campus of Sewanee College in Monteagle, Tennessee and was studying abroad at the time of the hearing.

15. Mr. Sterling's appraisal noted "Dolls" at a value of $600.00 which apparently consisted of seven dolls. Mrs. Sumerell testified that only

two of the dolls belonged to her and only two were listed in Schedules B and C, the others apparently belonging to various family members. Accordingly, five of the dolls should be excluded from the appraisal.

16. Statement 14 of the Statement of Financial Affairs entitled "Property Held For Another Person" directs the debtors to "[l]ist all property owned by another person that the debtor holds or controls." The debtors checked "None" as their response.

topped from denying ownership of these three items.

■ With respect to the Victorian Bed, the Queen Anne computer table and desk, however, Mr. Sterling was correct in including these items in his appraisal because these items are listed by the debtors in Schedules B and C as belonging to them. Schedules B and C recite that the debtors own and are claiming as exempt, five beds—three beds at $20.00 each plus the twin beds. In his appraisal, Mr. Sterling lists five different beds including the Victorian bed. Because only five beds were found in the house and the debtors assert in their schedules that they own five beds, the claimed exemption in five beds must include the Victorian bed.

Although the debtors testified at trial that the Queen Anne computer table and desk listed on Mr. Sterling's appraisal and located in the "Basement" belong to their son Patrick, this table and desk are listed in Schedules B and C as property of the debtors and exempt as tools of the trade under TENN. CODE ANN. § 26–2–103. The debtors are barred by the doctrine of judicial estoppel from directly contradicting their own sworn schedules. They can not now deny that they own these items and assert, to the contrary, that they are owned by their children.

■ With respect to the remaining pieces of furniture that the debtors claim belong to their children, the court is unable to ascertain from the debtors' generic listing of furniture in their schedules whether these items are listed in the debtors' Schedules B and C. No effort was made by either party to reconcile the schedules with Mr. Sterling's detailed appraisal so that a determination could be made as to whether the items found and examined by Mr. Sterling in the debtors' house were included in their schedules. "If the evidence is such that a decision on a point cannot be made one way or the other, the party with the burden of proof loses." *In re Shurley*, 163 B.R. at 291, *quoting Texas Distributors, Inc. v. Local Union No. 100*, 598

F.2d 393, 402 (5th Cir.1979). Because Wachovia has the burden of proof on this issue and tendered no evidence disputing Mrs. Sumerell's testimony that the items were in fact her children's (except for the answer to statement 14 of the Statement of Financial Affairs which the debtors have satisfactorily explained), all other items listed above which the debtors assert belong to their children should be excluded from Mr. Sterling's appraisal.

■ Although Wachovia asserted in its objection that the debtor significantly undervalued all of their personal property, Wachovia only presented evidence as to the value of the debtors' household goods and furnishings and tools of the trade. No proof was tendered by Wachovia to dispute the value placed by the debtors on their firearms, jewelry, clothing and fur coats. Under Fed. R.Bankr.P. 4003(c), the party objecting to a debtor's exemptions has the burden of proving that the exemptions are not properly claimed. *See also In re Shurley*, 163 B.R. at 286. Since Wachovia offered no proof as to the value of these items, its objection to the debtors' claim of exemptions in these items must be denied.

### VII.

As noted by Wachovia in its brief, upon a determination by the court that the debtors have undervalued their assets, it will be necessary for the debtors to amend their list of exemptions to set forth the proper values if they desire to continue to assert exemptions in the subject property. Wachovia alleges that the debtors should be denied the opportunity to amend Schedules B and C to accurately reflect the true value of their property, arguing that the debtors have acted in bad faith and with the intent to defraud the bankruptcy estate and its creditors. As evidence of bad faith, Wachovia alleges that Mr. Sumerell has concealed his ownership of Hampton Apartments, a 47–unit apartment building, and that the debtors through Mr. Sumerell's corporation[17] fraudulently trans-

---

17. According to his deposition testimony, Craven Sumerell was the sole stockholder and an officer and director of Bristol College Corporation d/b/a Bristol University, a school of higher learning with campuses in Bristol and Knoxville, Tennessee and Indianapolis, Indiana. Mrs. Sumerell was the only other officer and director. Mr. Sumerell testified that the school closed on April

ferred title to their two automobiles to their adult children. Wachovia also contends that the debtors' undervaluation of their assets is evidence of bad faith justifying denial of any amendment.

With respect to Hampton Apartments, it is undisputed that Patrick Sumerell, the debtors' son, has actual title to the property, having purchased it from Progressive Enterprises, an apparently unrelated third party, on September 21, 1993. Patrick Sumerell signed a promissory note for $85,800.00 and deed of trust in connection with the purchase, pledging the apartments as security for payment of the note. The evidence indicates that it was originally contemplated that the apartments would be purchased by Bristol University since the purpose of the purchase was to provide housing for the school's baseball team at its Bristol Campus. Craven Sumerell and the baseball coach for Bristol University negotiated the purchase on behalf of the school and Bristol University made a $500.00 down payment. In a letter dated August 13, 1993, to Bristol University, the agent for the seller made inquiry as to whom would be signing on behalf of Bristol University and Craven Sumerell responded in a handwritten note that he would be signing for the school. There was no evidence as to how it came about that five weeks later, Patrick Sumerell purchased the property instead of Bristol University.

Despite his ownership, Patrick Sumerell had little to do with the apartments.[18] Craven Sumerell maintained and managed the apartments on his son's behalf, including negotiating leases and filing detainer warrants to evict defaulting tenants until a state court judge informed Mr. Sumerell that only the owner could file such warrants. Rent on the apartments was collected from the Bristol University baseball players by the school's baseball coach who remitted the funds to the school's bookkeeper, Phyllis Gosnell. Ms. Gosnell deposited the rent receipts into an apartment account out of which she paid the monthly expenses on the apartments and the mortgage owed by Patrick Sumerell. Both

Craven Sumerell and Ms. Gosnell stated that the apartment account had been established by Ms. Gosnell and that only the two of them had signatory authority on the account. Ms. Gosnell also testified the account was a university account. Patrick Sumerell, on the other hand, testified that he had set up the account in his name but admitted that he had no signatory authority on the account and appeared to have no knowledge of Ms. Gosnell's signatory authority. Mr. Sumerell also had no knowledge that Bristol University had made a $500.00 down payment on the apartments.

Apparently, neither the debtors' nor Patrick Sumerell's 1993 tax return made any reference to the Hampton Apartments. However, the 1994 income tax returns filed by the debtors on April 15, 1995 listed Hampton Apartments as being wholly owned by them. Correspondingly, Patrick Sumerell's 1994 tax return gave no indication that he owned the apartments. At trial, both the debtors and Patrick Sumerell testified that their 1994 returns were incorrect due to an error by their accountant and that their returns had been recently amended to reflect the correct ownership.

As further evidence of bad faith, Wachovia refers to a 1990 Cadillac and a 1982 Mercedes used and operated by the debtors as their personal vehicles, but titled in the names of their adult children. These automobiles were not listed by the debtors in their schedules as property in which they have an interest. The evidence offered at trial indicated that the vehicles in question have apparently always been used by the debtors as their personal vehicles, although they were originally titled in the name of Bristol University. On February 19, 1993, Bristol University transferred the 1990 Cadillac automobile with a mileage of 59,300 to Missy Sumerell and in May 1993, transferred the 1982 Mercedes automobile with mileage of 303,280 to Patrick Sumerell. There is no dispute that no consideration was given for the transfers. Craven Sumerell testified that

29, 1994, although the corporation has never been legally dissolved.

18. At the time of the purchase, Patrick Sumerell was apparently living in Knoxville where he was director of Bristol University's Knoxville branch.

he made the transfers on the advice of his accountant, stating "I was just advised that with—the financial situation was coming down the way it was, we thought it would be a smart thing to do ..."

Notwithstanding the transfers, the debtors continued to operate and maintain the automobiles as their own after the transfers and do so at the present time. The debtors testified that they rely on these automobiles for transportation and that they do not have access to any other vehicles. At his August 3, 1995 deposition, Mr. Sumerell stated that these vehicles were used exclusively by him and his wife, but at trial testified that his previous statement was no longer true—that the vehicles are also used by his daughter and son. On cross-examination, Mr. Sumerell admitted, however, that his son has another automobile, also a Mercedes, and that his daughter is away at college, presently studying abroad. He noted that on occasion his daughter has taken the Cadillac to school with her, but conceded that his wife uses the automobile more than his daughter.

## VIII.

■ Fed.R.Bankr.P. 1009(a) provides that a voluntary petition, list, schedule or statement may be amended by the debtor as a matter of course at any time before the case is closed. Based on this language, many courts, including the Sixth Circuit Court of Appeals, have concluded that a court has no discretion to deny a request to amend unless the debtor has acted in bad faith or prejudice to creditors would result if the amendment were allowed. *Matter of Yonikus*, 996 F.2d 866 (7th Cir.1993); *Stinson v. Williamson (Matter of Williamson)*, 804 F.2d 1355 (5th Cir.1986), *appeal after remand*, 844 F.2d 1166 (1988); *Lucius v. McLemore*, 741 F.2d 125, 127 (6th Cir.1984) *(per curiam )*; *Doan v. Hudgins (In re Doan)*, 672 F.2d 831 (11th Cir.1982); *Magallanes v. Williams (In re*

*Magallanes)*, 96 B.R. 253 (9th Cir. BAP 1988); *Ward v. Turner*, 176 B.R. 424 (E.D.La.1994), *appeal dismissed*, 66 F.3d 322 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1027, 134 L.Ed.2d 106 (1996); *In re St. Angelo*, 189 B.R. 24 (Bankr.D.R.I.1995); *In re Fournier*, 169 B.R. 282 (Bankr.D.Conn. 1994).

■ Several courts have held that in order for an amendment to be denied on this basis, bad faith must be established by clear and convincing evidence in light of the permissive language of Fed.R.Bankr.P. 1009(a) and the well-established principle that exemptions are to be liberally construed in favor of the debtor.[19] *See Matter of Yonikus*, 996 F.2d at 872; *In re St. Angelo*, 189 B.R. at 26; *In re Robbins*, 187 B.R. 400, 401 (Bankr.D.Mass.1995); *In re Talmo*, 185 B.R. 637, 639 (Bankr.S.D.Fla.1995); *Kobaly v. Slone (In re Kobaly)*, 142 B.R. 743, 748 (Bankr.W.D.Pa.1992); *Brown v. Sachs (Matter of Brown)*, 56 B.R. 954, 958 (Bankr. E.D.Mich.1986). Other courts have required a "strong showing of abuse." *See Ameritrust v. Davidson (In re Davidson)*, 164 B.R. 782 (Bankr.S.D.Fla.1994), *affirmed in part and reversed in part*, 178 B.R. 544 (S.D.Fla. 1995); *In re Spoor–Weston, Inc.*, 139 B.R. 1009 (Bankr.N.D.Okla.1992), *appeal decided*, 13 F.3d 407 (10th Cir.1993). *See also In re Gaudet*, 109 B.R. 548 (Bankr.D.R.I.1989) ("clear showing" of bad faith of "sufficient magnitude" required). Judge Stair of this district held in a recent decision that a determination of bad faith sufficient to justify a denial of original or amended exemptions [20] must be based on a consideration of the "totality of the circumstances," wherein both the debtor's prepetition and postpetition conduct is examined, and that prepetition bad faith unrelated to the bankruptcy case itself, standing alone, is insufficient. *In re Clemmer*, 184 B.R. 935 (Bankr.E.D.Tenn.1995).

**19.** *See, e.g., In re St. Angelo*, 189 B.R. at 26 (exemptions are to be liberally construed in furtherance of the debtor's right to a fresh start); *In re Sivley*, 14 B.R. 905, 908 (Bankr.E.D.Tenn. 1981) (an exemption statute must be liberally construed to carry out its purpose).

**20.** The courts have, for the most part, not made a distinction between a denial of the right to amend exemptions and a denial of exemptions because the former usually results in the latter. This correlation is true in the present case. Unless the debtors are allowed to amend the exemptions which the court has disallowed, the debtors will be unable to assert an exemption in the vast majority of their household goods and furnishings.

Applying this standard to the facts of the present case, this court is not convinced that based on a consideration of the totality of the circumstances, there has been a sufficient showing of bad faith in connection with this bankruptcy case such that the debtors' exemptions should be denied. Despite Wachovia's allegation that the debtors fraudulently transferred their automobiles prepetition and that they intentionally concealed their interests in the automobiles and the apartments from this court, the evidence did not clearly establish that these assets are property of the estate or that the debtors' actions with respect to these assets were designed to defraud this court or the debtors' creditors. While Wachovia asserts that the apartments and vehicles belong to the debtors in all but name only, a better argument can be made that the assets rightfully belong to Bristol University. Prior to their transfer, the vehicles were titled in Bristol University's name and presumably paid for by the school. Although the Hampton Apartments were purchased in the name of Patrick Sumerell, they were purchased for use by Bristol University, Bristol University made the down payment and Bristol University employees collected the rent and paid the bills, including the mortgage, out of a university account, as some evidence suggests. Admittedly, the debtors listed Hampton Apartments as owned by them on their 1994 income tax return and the debtor Craven Sumerell managed the property, but it does not appear that the debtors ever financially benefitted from these actions.[21]

Minimal evidence was presented to the court regarding the financial problems sustained by Bristol University and the debtors that led to the closing of Bristol University and later, to the filing of the debtors' bankruptcy case,[22] but it does appear that the debtors' actions with respect to the automobiles and apartments were designed to protect the assets from the reach of creditors.[23] However, from the evidence presented to the court, it is just as likely that the targeted creditors from whom the debtors were shielding the assets were the creditors of Bristol University rather than those of the debtors based on the timing of the transactions in question in relation to the school's closing and this bankruptcy filing. The automobile transfers from Bristol University to the debtors' children occurred within the year prior to the closing of the school on April 29, 1994, when it had several judgments against it, but almost two years before the debtors' chapter 7 case was filed on May 15, 1995. The purchase of Hampton Apartments took place less than seven months before Bristol University closed, so it is not unlikely that the apartments were placed in Patrick Sumerell's name rather than the university's due to the school's pending financial difficulties.

Wachovia's response, of course, is that it is irrelevant whether the debtors or Bristol University owned the apartments and the vehicles because Mr. Sumerell was the sole stockholder of Bristol University. In its post-trial memorandum, Wachovia refers this court to the case of *Eisenberg v. Casale (In re Casale)*, 62 B.R. 889 (Bankr.E.D.N.Y. 1986), *affirmed*, 72 B.R. 222 (E.D.N.Y.1987), where property owned by the debtor's corporation and transferred prepetition to the debtor's attorney without consideration was brought into the debtor's estate because the transfer was a sham and a fraud as evidenced by the fact that the debtor and his family occupied the property and always had, they paid no rent to the attorney, the attor-

---

**21.** On their original 1994 tax return, the debtors did claim a deduction of $15,036.00 as a business loss on the apartments. However, the debtors had a net loss of $314,023.00 for 1994, so the $15,036.00 had no effect on the income taxes payable by the debtors for 1994, as illustrated by the fact that no tax payment was required of the debtors when they amended the return to omit the deduction.

**22.** Inexplicably, the parties incorrectly assumed that the court was familiar with the debtors,

Bristol University and the events involving the two that had transpired prior to trial.

**23.** As noted above, Mr. Sumerell testified that the automobiles were transferred to his children based on the advice of his accountant who told him that "it would be a smart thing to do" with "the financial situation ... coming down the way it was." Mr. Sumerell did not clarify whose financial problems prompted the transfers, and insufficient evidence prevented the court from so determining.

ney was not paying the mortgage and didn't know who was, the debtor's corporation was paying the mortgage despite the attorney's alleged ownership, and the transfer occurred one month after two substantial judgments were rendered against the debtor. The *Casale* court ruled that it was not necessary for the trustee to pierce the corporate veil to bring the corporation's asset into the debtor's estate, concluding that because the debtor was the beneficial owner of the property at the time the bankruptcy case was filed, the debtor's equitable interest in the property became property of the estate. *Id.* at 896, citing 11 U.S.C. § 541(a)(1).

While at first blush the *Casale* case appears on point to the present case and therefore persuasive authority, there are important substantive and procedural differences between the two cases which renders *Casale* inapplicable. First, *Casale* was a turnover action wherein the trustee sought the turnover of property of the estate pursuant to 11 U.S.C. § 542. The only issue before that court was whether a home in which the debtor was residing was property of the estate; the validity of the debtor's exemptions was not at issue, so there was no determination by *Casale* whether the debtor's conduct warranted a denial of his exemptions.

 Secondly, of significant importance to the *Casale* court's ·conclusion that the debtor had an interest in the subject property was the court's finding that the debtor's corporation which initially owned the property was a shell, a mere facade for the debtor's own operations. The corporation's sole function was to build and hold legal title to the debtor's home and to serve the personal needs of the debtor. *Id.* at 898. Bristol

University, on the other hand, from what the court surmises, was not a shell corporation. It owned substantial assets and was engaged in the business of owning and operating a school of higher learning, with three campuses. Thus, its corporate structure is not so easily disregarded and its corporate veil must be pierced before its assets could be considered part of its shareholder's bankruptcy estate.[24] That has not been done in this case.[25]

It is clear, as illustrated in *Casale*, that the debtors at a minimum have a beneficial interest in at least the automobiles due to their possession and use of the vehicles regardless of who has legal title and that this equitable interest is property of the estate. This interest should have been disclosed by the debtors in their schedules. There has been no request by the trustee, however, that the debtors turnover these interests and the court is not convinced that the debtors' failure to disclose this equitable interest is of sufficient magnitude to warrant the conclusion that the debtors have been acting in bad faith.

Nor does the debtors' undervaluation of their household furnishings provide a sufficient basis for a finding of bad faith. Although it is clear that these assets were substantially undervalued, the values were based on the debtors' opinion of the goods' liquidation value, their valuation was supported by the testimony of their expert and there was at least an arguable position that liquidation value was the appropriate standard.

As in *Clemmer*, the evidence does establish that the debtors engaged in prepetition ef-

---

**24.** Ordinarily, courts are asked to "pierce" the corporation's "veil" in order to subject the corporation's shareholders to personal liability for claims against the corporation. An attempt to reach the assets of the corporation in order to satisfy the debts owed by a shareholder is often referred to as "reverse piercing." The inquiry, however, is still the same: whether the facts of the case justify piercing the corporate veil. *See Ames Investment, Inc. v. United States of America,* 36 F.3d 1097 (6th Cir.1994) (unpublished opinion).

**25.** The fact that a corporation is closely held and the stockholders are also officers and directors is

generally insufficient to disregard the corporate veil, although such facts can be evidence of the exercising of dominion and control. *See McLemore v. Olson (In re B & L Laboratories, Inc.),* 62 B.R. 494, 503 n. 4 (Bankr.M.D.Tenn.1986), citing *Kopper Glo Fuel, Inc. v. Island Lake Coal Co.,* 436 F.Supp. 91, 99 (E.D.Tenn.1977). For the elements required to pierce the corporate veil, *see Federal Deposit Insurance Corporation v. Allen,* 584 F.Supp. 386 (E.D.Tenn.1984); *In re B & L Laboratories, Inc.,* 62 B.R. at 503; *Continental Bankers Life Insurance Company of the South v. Bank of Alamo,* 578 S.W.2d 625 (Tenn.1979).

forts to protect the automobiles and arguably the apartments from the reach of creditors. However, except for the debtors' failure to disclose their equitable interests in these assets, there has been little evidence of any misconduct by the debtors in connection with this case. There was no evidence that the debtors have failed to cooperate with the trustee or that they have engaged in dilatory actions to delay the administration of this case. While the court by no means wishes to minimize the seriousness of the debtors' misconduct, the court does not find that there has been a sufficient showing of bad faith or fraud, particularly in connection with the bankruptcy case itself, to justify a denial of exemptions.

Furthermore, this court is not persuaded that even if the requisite showing of bad faith or fraud had been established, that denial of exemptions, unrelated to the alleged fraud, is the appropriate remedy. The Bankruptcy Code is silent as to the effect of fraud on exemptions, except for § 522(g) which deals with an exemption claimed as to recovered property.[26] 3 COLLIER ON BANKRUPTCY ¶ 522.08 (15th ed. 1995). Instead, under the Code, fraud is primarily dealt with in the context of discharge and dischargeability such that certain debts are nondischargeable or a discharge is denied altogether for certain types of fraud. *See* 11 U.S.C. §§ 523(a)[27] and 727(a).[28] Disallowance of exemptions is a judicially imposed punishment generally based on the equitable premise that "by fraudulent conduct the debtor has forfeited the protection the state would otherwise give." *In re Clemmer*, 184 B.R. at 942, *quoting* 3 COLLIER ON BANKRUPTCY ¶ 522.08 (15th ed. 1995). The overwhelming majority of cases wherein exemptions have been denied because of the debtor's fraud involved fraud related to the property in which the debtor sought to claim an exemption, either the debtor engaged in fraudulent prebankruptcy planning by converting nonexempt assets into exempt goods, *see, e.g., Meininger v. Miller (In re Miller)*, 188 B.R. 302 (Bankr.M.D.Fla.1995) and *In re Krantz*, 97 B.R. 514 (Bankr.N.D.Iowa 1989); or intentionally concealed an asset and then claimed it exempt upon its discovery. *See, e.g., Matter of Yonikus*, 996 F.2d at 866 (attempted amendment to assert exemption in workers' compensation award denied due to debtor having fraudulently concealed the cause of action); *In re St. Angelo*, 189 B.R. at 24 (court held that debtor's willful and fraudulent failure to disclose personal injury litigation barred debtor from amending exemptions to claim person injury award exempt). *Cf. Ward v. Turner*, 176 B.R. at 424 (attempted amendment to claim Louisiana exemption in approximately 1553 items three

---

**26.** 11 U.S.C. § 522(g) prohibits a debtor from exempting property that the trustee recovers pursuant to the avoidance and recovery powers of §§ 510(c)(2), 542, 543, 550, 551 or 553 of the Code if the transfer was voluntary or the property had been concealed by the debtor. 3 COLLIER ON BANKRUPTCY ¶ 522.08 (15th ed. 1995).

**27.** Sections 523(a)(2), (4) and (6) are the so-called fraud exceptions to discharge. Section 523(a)(2) of the Code provides that a debt for money, property, services, *etc.* obtained by (1) false pretenses, a false representation or actual fraud, or (2) use of a materially false written statement regarding the debtors' financial condition with the intent to deceive reasonably relied by the creditor, is nondischargeable. Section 523(a)(4) excepts debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny," while § 523(a)(6) renders nondischargeable a debt for willful or malicious injury.

**28.** 11 U.S.C. § 727(a)(1) provides as a basis for a denial of discharge that the debtor with the

intent to defraud a creditor or an officer of the estate transferred, removed, destroyed, mutilated or concealed property of the debtor within one year before the date of the filing or property of the estate after the filing. Under 11 U.S.C. § 727(a)(3), a debtor who has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information from which the debtor's financial condition may be ascertained may be denied a discharge. Subsection 727(a)(4) directs a denial of discharge for any debtor who knowingly and fraudulently in connection with the case made a false oath, presented a false claim, offered, gave, received or attempted to obtain money, *etc.* for acting or forbearing to act or withholding from an officer of the estate entitled to possession any recorded information related to the debtor's property or financial affairs. A debtor may be denied a discharge under § 727(a)(5) for failing to satisfactorily explain any loss or deficiency of assets, while § 727(a)(7) allows as a basis for denial of discharge, a commitment of any of the acts specified in paragraphs (2), (3), (4), (5) or (6) within one year preceding the bankruptcy filing.

years after denial of original exemptions under Texas law denied for bad faith where debtor had intentionally withheld financial information and concealed assets from court and trustee); *In re Larson*, 143 B.R. 543 (Bankr.D.N.D.1992) (bad faith justifying denial of exemptions where debtor 'parsimoniously' exempted nominal value for nearly every exempted asset, leaving assets subject to partition and liquidation by trustee).

 In the few cases where a trustee or creditor has requested that a debtor's exemptions be denied as punishment for fraud unrelated to the claimed exemptions, the courts have generally been reluctant to do so in the absence of any specific statutory authority. *See In re Hayes*, 119 B.R. 86 (Bankr.E.D.Va.1990); *Everwed Co. v. Ayers (In re Ayers)*, 25 B.R. 762 (Bankr.M.D.Tenn. 1982). *But see In re Gaines*, 106 B.R. 1008 (Bankr.W.D.Mo.1989), opinion quashed, 121 B.R. 1015 (W.D.Mo.1990), dismissed, *Gaines v. Nelson*, 985 F.2d 564 (8th Cir.1991). As noted above, the Bankruptcy Code supplies no such authority nor is any provided by the state of Tennessee. *See* 3 COLLIER ON BANKRUPTCY ¶ 522.08 (15th ed. 1995) (if state exemptions are claimed, the court must refer to state law to determine whether the conduct warrants denial of the exemptions). There is no Tennessee statute [29] either withdrawing the entitlement to exemptions if fraud has occurred or giving the court the discretion to withdraw exemption privileges under these circumstances, and there are no reported decisions wherein a Tennessee court has disallowed a claim of exemptions upon a finding of bad faith or fraud.[30]

In the *Ayers* case, the trustee argued that the debtors' claim of exemptions should be denied because the debtors were guilty of fraud. The debtors therein had failed to claim certain property exempt which could have been claimed exempt, other property was not dealt with as specifically as it should have been, and the debtors postpetition purchased property with nonexempt, prepetition funds. *In re Ayers*, 25 B.R. at 778. The *Ayers* court concluded that the trustee had not proven that the debtors were guilty of fraud and further overruled the objection on the basis that the alleged fraud was unrelated to the exemptions. *Id.* The court quoted with approval the following language from the treatise COLLIER ON BANKRUPTCY:

> Where it can be shown that the debtor has in some manner caused the removal of or has secreted a part of his property so that it has not been or cannot be recovered, or where its disappearance is not satisfactorily explained, it has been held by some courts that such conduct forfeits all right to exemptions. (Citations omitted)
>
> . . . .
>
> Some courts however, have not accepted this rule. (Citations omitted). In light of the strong exemption policy of the Code, the latter group of cases should be followed. The grounds for denial of discharge include removal of assets, and that should be the sole remedy. Exemptions(s) are not treated by the Code as a "carrot on a stick" and the families of even dishonest debtors need support and should not become charges upon the state.

*Id.* at 778–779, *quoting* 3 COLLIER ON BANKRUPTCY ¶ 522.08 n. 10 (15th ed. 1981).

---

29. TENN.CODE ANN. § 26–2–115(b) does provide in material part that:

> Upon application of the judgment creditor, the court may inquire into the truth and sufficiency of the debtor's claim for exemption, and may, where the debtor knowingly makes false claim for exemption, enter an order denying the debtor the right to make further claim for exemption as to that creditor's judgment.

As noted by Judge Stair in *Clemmer*, this statute pertains only to the truth and sufficiency of the assertion of the exemption and has no bearing on any fraudulent conduct that may have occurred prior to claiming the exemption. *In re Clemmer*, 184 B.R. at 945.

30. The Tennessee Supreme Court did state *in dicta* over a century ago that:

> The exemption laws of the state were intended as a protection to honest poverty—to secure to the indigent citizen a frugal maintenance for his family. They have been construed by the courts with uniform liberality, and in some case, perhaps, with more liberality than justice. They were never intended as a covert behind which a cunning operator could enrich himself by traffic, and still defy his just creditors.

*Simons v. Lovell*, 54 Tenn. (7 Heisk.) 510, 514 (1872).

Similarly, in *Hayes* the trustee argued that the debtor's litany of false statements in his bankruptcy schedules constituted an attempt by the debtor to defraud his creditors by concealing his assets and requested that as a consequence of this conduct, the court deny the debtor's homestead exemption. Despite the debtor's voluminous misstatements and omissions in connection with his bankruptcy case, which caused the court to question the debtor's veracity, the court concluded that denial of exemptions was not the appropriate remedy. *In re Hayes*, 119 B.R. at 87. As stated by the court:

> Egregious as the debtor's conduct may be, the Court is unable to cite any Virginia authority squarely holding that a debtor forfeits his right to claim his homestead exemption as a consequence for fraudulent conduct. In the absence of relevant Virginia authority bearing on the question, the Court will not deprive the debtor of his entitlement to his homestead exemption.
>
> . . . .
>
> [T]he Court ... believe[s] that where, as here, state law does not provide for the denial of the homestead exemption for fraudulent conduct, the proper course of conduct for the trustee to follow is to object to discharge.

*Id.* at 88–89.

Other courts have shown this same reluctance even in circumstances where there is a connection between the fraud and the exemption. For example, in a case from the Western District of Texas, *In re Swift*, 124 B.R. 475 (Bankr.W.D.Tex.1991), the bankruptcy court refused to deny the debtor's exemption claims even though the debtor engaged in prebankruptcy planning with the intent to defraud his creditors, stating:

> In the absence of a statutory basis for denying a debtor's exemption (such as that afforded by Section 42.004(a) of the Texas Property Code, for example), this court is reluctant to conclude that exemption claims can be disallowed solely based on a theory of impermissible pre-bankruptcy planning. There of course is great appeal to preventing a perceived malfeasor from enjoying the fruits of his or her malfea-

sance, especially when the appeal is made to a court sitting in equity. *See Pepper v. Litton*, 308 U.S. 295, 307, 308, 60 S.Ct. 238, 245–46, 246, 84 L.Ed. 281 (1939). Nonetheless, bankruptcy courts should not be seduced into such a course of action, for two reasons. Firstly, such an attack undermines existing state law property entitlements, not in service to the supremacy of a federal enactment but merely in an effort to "do the right thing," as it were. A creditor could eliminate exemptions for "improper conduct" in bankruptcy court notwithstanding the lack of a federal statutory basis, and thereby deprive the debtor of the very state law exemptions which he or she would enjoy absent bankruptcy.... Even the Bankruptcy Code itself contemplates the preservation of those state law exemption entitlements. 11 U.S.C. § 522(b)(2)(A); *see In re Komet*, 104 B.R. 799, 809 (Bankr.W.D.Tex.1989). Federal courts should be loathe to interfere with such entitlements absent specific congressional authorization....

> Secondly, the thrust of the Movant's appeal is at bottom an attack on the debtor's right to discharge, albeit couched in terms of objections to exemptions. The Bankruptcy Code and Rules provide specific procedures for challenging entitlement to discharge.... Instituting a case law procedure such as that suggested here would create a wholly separate, unregulated alternative to the statutory procedures for objecting to discharge which this court believes would be inconsistent with clearly expressed congressional intentions.

*Id.* at 482–483; *see also In re Clemmer*, 184 B.R. at 944–945 (court's refusal to deny exemptions as punishment for debtor's prepetition concealment of assets based in part on absence of Tennessee statutory or case law authority); *In Crews v. First Colony Life Insurance Company (In re Barker)*, 168 B.R. 773 (Bankr.M.D.Fla.1994) (court refused to disallow an otherwise valid state law exemption on the basis of fraud in the absence of any express authority in the Bankruptcy Code and in light of the availability of other express remedies: denial of discharge, dismissal of case, and avoidance of the fraudu-

lent conveyance); *In re Davidson*, 164 B.R. at 782 (court refused to deny exemptions as remedy for fraud in absence of specific statutory authority or "strong showing of abuse" justifying exercise of court's § 105 equitable powers); *In re Spoor–Weston, Inc.*, 139 B.R. at 1016.

■ This court agrees that caution should be exercised before a court utilizes its equitable powers to fashion a remedy for fraud that is not expressly authorized by the Bankruptcy Code. This principle is demonstrated by the Supreme Court's ruling in *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), wherein the court held that a trustee in a chapter 7 case could not successfully object to a debtor's claimed exemption after the time provided by Fed.R.Bankr.P. 4003(b) had run, even though the debtor had no colorable basis in law for claiming the exemption. The court rejected the trustee's argument that the court had the discretion to invalidate exemptions after the expiration of the 30–day period if the debtor did not have a good faith basis for claiming the exemptions despite the trustee's assertion that such a ruling would encourage abusive, bad faith exemption claims by debtors. The court observed that debtors and their attorneys face penalties under various provisions for engaging in improper conduct in bankruptcy proceedings and that these provisions may limit any abuses. "To the extent that they do not, Congress may enact comparable provisions to address the difficulties that [the trustee] predicts will follow our decision. We have no authority to limit the application of section 522(1) to exemptions claimed in good faith." *Id.* at 644–645, 112 S.Ct. at 1648–1649. Although the court refused to consider whether the courts may disallow exemptions not claimed in good faith based on their § 105(a) powers (the trustee having not raised this issue before the lower courts), inherent in the court's ruling is the directive that courts should be wary before providing remedies for policy reasons for which there is no authority in the Code. *See In re Brown*, 178 B.R. 722, 725 (Bankr.E.D.Tenn.1995).

■ As several courts have noted, the Code expressly provides other punishments for fraud: a denial of discharge completely or of a particular debt, dismissal of the case, or, if the fraud was in connection with the transfer of an asset, avoidance of the transfer and recovery of the asset. *See* 11 U.S.C. § 548. Clearly, Congress knew how to fashion remedies for fraud. Congress' failure to expressly provide for denial of exemptions in the event of fraud suggests that this omission was intentional.

■ Furthermore, caution is particularly appropriate in the area of exemptions, which have historically been liberally construed in favor of the debtor, not as a reward but because such a policy furthers the public interest of promoting a fresh start and preventing the debtors and their dependents from becoming completely destitute. In the absence of legislative authority, any decision that would revise this policy should be rendered sparingly, only where the fraud or bad faith is of such magnitude that no other authorized remedy is sufficient to protect and safeguard the public interest. *See* 11 U.S.C. § 105(a) ("the court may ... tak[e] any action or mak[e] any determination necessary or appropriate ... to prevent an abuse of process").

## IX.

In conclusion, the debtors are directed to file a new Schedule C setting forth their exemption claims in accordance with the rulings of the court set forth in this memorandum. All personalty claimed exempt must be valued at the value set out in the appraisal prepared by Kimball Sterling, unless provided otherwise in this memorandum. An order will be entered contemporaneously with the filing of the memorandum opinion.